# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LAURA BARBU, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>PACIFIC MARKET INTERNATIONAL, LLC, a corporation,<br><br>           Defendant. | Civil Action No. 2:24-cv-00258<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiff Laura Barbu, individually and on behalf of all others similarly situated, by and through her  undersigned attorneys, brings this Class Action Complaint against Defendant Pacific Market International, LLC ("Defendant," "PMI" or "the Company") for deceptive and unfair business practices and unlawful actions in connection with the design, manufacture, advertising, and sale of  its wildly popular -- but defective -- Stanley cups in the United States ("Stanley cup" or "Stanley cups"), including this District.  For years, the Company created the false impression that its Stanley cups were THE quintessential accessories to achieve a healthy lifestyle.  It was not until January of 2024 that the Company was forced to publicly admit that its Stanley cups contain lead – one of the most harmful heavy metals. Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Classes (defined below). Plaintiff alleges the following based upon personal knowledge as well as investigation by her counsel and, as to all other matters, upon information and belief. Plaintiff believes that a reasonable opportunity for discovery will reveal substantial evidentiary support for the allegations set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds

$5,000,000 exclusive of interest and costs and more than two-thirds of the Class members reside in states other than the states in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff has suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this District, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## PARTIES

4.      Plaintiff Laura Barbu is a resident of Suffolk County, New York.  Plaintiff Barbu purchased three (3) Stanley 40 oz. Stainless Steel Adventure Quencher Tumbler cups  for personal use and not for resale from www. target.com (one cup per transaction) between March and May of 2022, each of which she picked up in person at Target in Commack, New York.  Based on Defendant's material omissions, Plaintiff Barbu was unaware that the Stanley cups contained any lead and would not have purchased them or  would not have paid as much for them if that information were fully disclosed. Plaintiff was injured by paying a substantial premium for the Stanley cups whose value was less than what Plaintiff Barbu paid for them based on the presence of the lead.

5.      As the result of Defendant's negligent and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid the purchase price or a price premium for the Stanley cups. Plaintiff would not have paid this money had she known that the Stanley cups contained any level of lead.

6.      Defendant PMI is a Washington limited liability company with its principal place of business located at 2401 Elliott Avenue Fl. 4, Seattle, Washington 98121. Defendant manufactures, distributes, markets, advertises, and sells the Stanley cup throughout the United States, including in this District, during the relevant period herein (defined below), both directly to consumers and through intermediaries.

---

1

2 **FACTUAL ALLEGATIONS**

3     **A.**    **The Dangers of Lead**

4     7.    Lead is a carcinogen and developmental toxin. It is dangerous in even trace

5 amounts.

6     8.    The U.S. Food and Drug Administration ("FDA") and World Health Organization

7 ("WHO") have declared lead "dangerous to human health."[1]

8     9. Lead is poisonous and "disturbs the functions of almost every organ in the human body[.]"[2]

9     10. "No amount of lead is known to be safe," and its effects cannot be reversed or remediated.

10 The FDA, CDC, EPA, American Academy of Pediatrics ("AAP"), and WHO have all plainly

11 stated that there is no safe level of lead.[3]

12

13

14

15

16

[1] *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Feb. 4, 2021 (hereinafter "House Report") at 2, *available at* http://tinyurl.com/ytxswcar (last accessed Feb. 22, 2024).
[2] M Samuel Collin, et al, *Bioaccumulation of lead (Pb) and its effects on human: A review*, Journal of Hazardous Materials Advances (Aug. 2022).
[3] FDA, *Lead in Food and Foodwares*, *available at* https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last accessed Feb. 22, 2024); CDC, *Health Effects of Lead Exposure*, available at https://www.cdc.gov/nceh/lead/prevention/health-effects.htm#:~:text=Exposure%20to%20lead%20can%20seriously,Learning%20and%20behavior%20problems (last accessed Feb. 22, 2024); *Biden-Harris Administration Proposes to Strengthen Lead Pain Standards to Protect Against Childhood Lead Exposure*, EPA, July 12, 2023, available at https://www.epa.gov/newsreleases/biden-harris-administration-proposes-strengthen-lead-paint-standards-protect-against (last accessed Feb, 22, 2024); AAP, Lead Exposure in Children, available at https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children (last accessed Feb. 22, 2024); WHO, Lead Poisoning, (hereinafter "WHO, Lead Poisoning") available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health; see *also* USA Today, *FDA: Recalled Applesauce Pouches Had Elevated Lead Levels and Another Possible Contaminant* (Jan. 5, 2024), at https://www.usatoday.com/story/money/food/2024/01/05/applesauce-pouch-recall-contamination-spreads/72121869007/ (last accessed Feb. 22, 2024).

11.         "No safe level of exposure has been identified."[4]  No amount of lead is known to be safe because "there is no known safe blood lead concentration."[5] Even exposure to very low levels of lead can "cause lower academic achievement, attention deficits and behavior problems,"[6] and, when exposure is consistent, has been "found to reduce the cognitive capacity of children."[7] "[P]rolonged intake of even [] low level[s] of lead is hazardous to human beings."[8] Lead has been conclusively found to have no positive physiological role in the body, "while its harmful effects are manifold."[9] The effects of lead have also been well studied at the cellular level, and "heavy metals, including lead, create reactive radicals which damage cell structures, including DNA and cell membrane."[10]

12.         The Centers for Disease Control and Prevention warned "[w]hen lead is used in manufacturing, there is a risk of lead exposure for consumers of those products, especially for products intended for use in food consumption, like drinkware."[11]

13.         According to Jenna Forsyth, Ph.D., a research scientist specializing in epidemiology and environmental science at Stanford University School of Medicine, "[m]ost people think of lead poisoning as a thing of the past, but lead is still all around us, often at dangerous enough levels to cause significant harm[.]"[12]

---

[4] Healthy Babies Investigation Report, https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 22, 2024) at 18; *see also* House Report, *supra* n.1 at 11.

[5] WHO, Lead Poisoning, *supra* n.3.

[6] Healthy Babies Investigation Report, *supra* n.4 at 18; *see also* House Report, *supra* n.1 at 11.

[7] Needleman HL, et al., *The long-term effects of exposure to low doses of lead in childhood--An 11-year follow-up report*, N Engl. J Med. 1990; 322:83–88.

[8] Wani AL, et al., *Lead toxicity: a review*, Interdiscip. Toxicol. Vol. 8, No. 2, pp. 55-64 (June 2015) (hereinafter "*Lead toxicity: a review*").

[9] *Id.*

[10] Kosnett MJ. Lead. In: Olson K.R, ed. Poisoning and Drug Overdose. 5th ed. McGraw Hill Professional (2006).

[11] Daryl Austin, *Do Stanley cups contain lead or pose a risk of lead poisoning? Experts weigh in*, USA Today (Jan. 24, 2024).

[12] *Id.*

CLASS ACTION COMPLAINT

14.     Lead has a half-life of roughly 30 days in the blood, "after which it diffuses into soft tissues such as the kidneys, brain, and liver and is  then distributed  to bones, teeth and hair as lead phosphate."[13]

15.     Prolonged exposure to lead accumulates in the body, leading to lead poisoning or toxicity.[14]

16.     Lead from foods builds up in the body over time. Lead build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental and reproductive disorders, as well as serious injuries to the nervous system and other organs and body systems.

17.     Lead accumulation is a major health concern. The consumption of lead contaminated food and water are *direct* sources of accumulation.

18.     Lead exposure in children is particularly dangerous. Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems" and in fact, "[n]o safe level of exposure has been identified."[15]

19.     Once lead exposure ceases, the amount of lead in the blood decreases gradually. However, lead is also stored in the bones and it "can take decades for lead stored in the bones to decrease."[16]

20.     Lead exposure in adults can cause neuropathy, a nerve condition that can lead to pain, numbness, weakness or tingling in one or more parts of the body. Other effects include reduced sperm count and hypertension and, depending on the blood lead level, decreased renal function, increased blood pressure, and hypertension.[17]

---

[13] M Samuel Collin, et al, *Bioaccumulation of lead (Pb) and its effects on human: A review*, Journal of Hazardous Materials Advances (Aug. 2022)

[14] *Id*.

[15] Healthy Babies Investigation Report, *supra* n.4.

[16] Health Effects of Lead Exposure, https://www.cdc.gov/nceh/lead/prevention/health-effects.html (last accessed Feb. 22, 2024).

[17] What  Are  Possible  Health  Effects  from  Lead  Exposure?  (May  24,  2023), https://www.atsdr.cdc.gov/csem/leadtoxicity/physiological_effects.html  (last  accessed  Feb.  22, 2024).

---

21.      Jane Houlihan, a research director for Healthy Babies, Bright Futures, an alliance whose mission is to reduce babies' exposures to neurotoxic chemicals, opined that "lead is so toxic you just can't take chances with it[.] If a company has to rely on their product remaining perfectly intact in order for it to be safe, that company has a basic material safety problem that they are passing on to their customers."[18]

22.      Lead is an "all-systems toxin" meaning "[t]here isn't a system in your body — from your nervous system to your immune system to your reproductive system — that isn't harmed by it." [19]

23.      According to the World Health Organization, "[t]here is no level of exposure to lead that is known to be without harmful effects."[20]

**B.  Defendant PMI's Stanley Cups and The Company's Admission of Lead**

24.      For years, PMI has created the false impression that its Stanley cups are healthy accessories to aid active lifestyles:  they are large enough to keep up with busy days; have handles to carry them wherever you go; are represented to be dishwasher safe; fit into car cupholders; are vacuum insulated to keep ice cold for more than twelve hours, and contain straws.

25.      The Company's extremely popular Quencher H2.0 Flowstate Tumblers are marketed as "Your trusted companion whether you're hitting the road or your morning spin class."[21]

26.      PMI markets its products as dishwasher safe, practical, "made with BPA-free 90% recycled 18/8 stainless steel," and "manufactured to last a lifetime."[22] According to the California Department of Public Health, "[i]f a dish contains lead, using the dishwasher can damage the

---

[18] Madeline Holcombe and Sandee LaMotte, *Stanley and other drink cups contain lead. Should you be worried?*, CNN (Jan. 26, 2024).

[19] Daryl Austin, *Do Stanley cups contain lead or pose a risk of lead poisoning? Experts weigh in*, USA Today (Jan. 24, 2024).

[20] Lead Poisoning (Aug. 11, 2023), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last accessed Feb. 22, 2024).

[21] The Quencher H2.O Flowstate Tumbler, https://www.stanley1913.com/products/adventure-quencher-travel-tumbler-40-oz?_pos=2&_sid=2d76b9390&_ss=r?variant=44559880978559 (last accessed Feb. 22, 2024).

[22] Sustainability at Stanley, https://www.stanley1913.com/pages/sustainability (last accessed Feb. 22, 2024).

glazed surface.  This can make is more likely to leach into food the next time it is used.  In addition, in some cases, lead may contaminate other dishes in the dishwasher…and the lead-leaching process can still take place if the surface is not broken or worn.  However, if the surface is chipped, there may be a greater exposure to lead."[23]

27.     The Company is said to provide "values-led manufacturing"[24] and advertises its products as "your trusted companion[.]"[25]

28.     In 2019, the Stanley Adventure Quencher Travel Tumbler was  selling poorly. PMI partnered with Buy Guide, an affiliate-marketing site based in Utah, to launch a marketing campaign. Buy Guide coached PMI to launch "an affiliate-marketing system through which fans could make money by driving sales."[26] This resulted in a substantial sales increase, with the Stanley brand leaping from $70 million in annual sales in [what year] to over $750 million in 2023.

29.     The enormous success of the Stanley Adventure Quencher Travel Tumbler led to the launch and subsequent popularity of other Stanley cups designed with the same insulation system and unique aesthetics.

30.     It was not until January 2024, in response to a number of reports alleging the presence of lead in PMI products, that PMI was forced to admit that the manufacturing process for Stanley cups utilizes a sealing material that contains lead.[27]

31.     PMI admitted also that the base cap (a button cover on the bottom of the cup) of a product may "come[] off due to ordinary use and expose[] this seal",[28] thus exposing the consumer to unwanted lead exposure.

---

[23] California Department of Public Health, Childhood Lead Poisoning Prevention Branch, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/CLPPB/Pages/Q-A-Lead-in-Tableware.aspx#:~:text=If%20a%20dish%20contains%20lead,other%20dishes%20in%20the%20dishwasher (last accessed Feb. 22, 2024).
[24] Sustainability at Stanley, https://www.stanley1913.com/pages/sustainability (last accessed Feb. 22, 2024).
[25] The Quencher H2O Flowstate Tumbler, https://www.stanley1913.com/products/adventure-quencher-travel-tumbler-40-oz?variant=44559859613823 (last accessed Feb. 22, 2024).
[26] Kyle Chayka, *How the Stanley Cup Went Viral*, The New Yorker (January 30, 2024).
[27] Do Stanley products contain lead? Stanley 1913, https://support.stanley1913.com/en/support/solutions/articles/69000850923-do-stanley-products-contain-lead (last accessed Feb. 23, 2024).
[28] *Id*.

32.       PMI failed to disclose that, if damaged, the Stanley cup could expose consumers to lead. Thus, PMI knowingly misled consumers by failing to disclose that fact that a reasonable consumer would want to know before purchasing.

33.       PMI advertises and markets its Stanley cups to consumers who enjoy active lifestyles, and such lifestyles increase the risk of damaging the product and exposing consumers to the lead used to manufacture that very product.

34.       The presence of lead at any level would be material to a reasonable consumer due to the inherent and known risks of consumption and exposure.

35.       PMI's explanation of lead use shows that PMI deliberately used lead in its cups' vacuum seals while knowing that Stanley cups could be damaged even through ordinary use.

36.       PMI knowingly sells the Stanley cups to unsuspecting consumers. More specifically, it advertises and sells the Stanley cups to consumers with the assurance that they can be used during activity (*i.e.*, hiking and climbing) where a consumer could drop and/or damage the Stanley cups. Yet, PMI fails to warn of lead exposure.

37. PMI had a duty to disclose its use of lead before enticing millions of customers to buy its Stanley cups. Indeed, Stanley cup sales have "gone viral" and are being resold on secondary markets for multiples of their retail prices.

38.       PMI contends that its use of lead to seal insulation is the "industry standard[29]" but provides no evidence to support that contention. In fact, several other water bottle companies – including Hydro Flask, Owala, and Klean Kanteen, do not use lead in their manufacturing.[30]

39.       Plaintiff and the Classes had a right to make an informed decision of whether to purchase a Stanley cup, but this right was taken away by Defendant's failure to warn purchasers of the presence of lead.

40.       Based on Defendant's decision to wholly omit the presence of lead, and to instead advertise, package, and market its Stanley cups as made with BPA-free 90% recycled 18/8

---

[29] Do Stanley products contain lead? Stanley 1913, https://support.stanley1913.com/en/support/solutions/articles/69000850923-do-stanley-products-contain-lead- (last accessed Feb. 22, 2024).
[30] Daryl Austin, *Do Stanley cups contain lead or pose a risk of lead poisoning? Experts weigh in*, USA Today (Jan. 24, 2024).

stainless steel, it had a duty to ensure that these statements were true and not misleading. As such, Defendant knew or should have known the Stanley cups contained lead to which consumers could be exposed.

41.     Defendant intentionally omitted the presence of lead in the Stanley cups to induce and mislead reasonable consumers to purchase the Stanley cups.

42.     As a result of the material omissions, a reasonable consumer would have no reason to suspect the presence of lead in the Stanley cups without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

43.     PMI has advertised its product for "adventures" such as "scaling a mountain" or "climbing a tree." Yet, PMI knew that these activities could increase the risk of the Stanley cups being damaged thereby exposing the seal and exposing consumers to the lead used in the seal. PMI markets its products for a healthy and active lifestyle. PMI's advertisements often show the Stanley cups being used by individuals while exploring or exercising.

44.     PMI markets and advertises its Stanley cups as durable. Its advertisements show consumers using the Stanley cups while exercising, hiking, skateboarding, biking, among other high impact activities. Yet PMI knew, or should have known, that these products were manufactured with lead, which can be exposed if the product is altered during one of these activities. PMI failed to notify consumers of this fact.

45.     Furthermore, other water bottle manufacturers have produced products that are free of lead.

46.     Hydro Flask, for example, created an alternative process over a decade ago for sealing bottles without the use of lead.[31] Similarly, Owala bottle "are lead free. Always Have Been. Always Will Be." Owala has used a lead-free process "from the very beginning[.]"[32]  Klean Kanteen also manufactures and sells products that are free of lead. It uses a different type of plug

---

[31] Does Hydro Flask use lead for sealing its bottles and tumblers? Jan. 29, 2024, https://faq.hydroflask.com/en_us/does-hydro-flask-use-lead-for-sealing-bottles-and-tumblers-HkQrgJLq6 (last accessed Feb. 23, 2024).

[32] Do Owala bottles/tumblers contain lead?, https://owalalife.com/pages/faq (last accessed Feb. 23, 2024).

CLASS ACTION COMPLAINT

to create its vacuum insulated product.[33]  Thus, there are many ways for manufacturers, like PMI, to significantly reduce or eliminate lead from their products.

47.     PMI intended that the advertising, labeling, statements, and representations would be considered by purchasers of the Stanley cups, including Plaintiff and the proposed Class.

48.     PMI directly marketed to Plaintiff and the proposed Classes through statements on its website, labeling, advertising, and packaging.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in the United States who, during the applicable limitations period to the present, purchased a Stanley cup for personal use, and not for resale (the "Class").

50.     Plaintiff also brings this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in New York who, from the applicable limitations period to the present, purchased a Stanley cup for personal use, and not for resale (the "New York Subclass").

51.     The Class and New York Subclass are collectively referred to as the "Classes."

52.     Excluded from the Classes are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

53.     This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable. Purchasers of the Stanley cups can identify their purchases through receipts, store rewards programs, and their own testimony.

---

[33] Do Klean Kanteens have BPA, lead, phthalates or heavy metals?, https://www.kleankanteen.com/pages/faq (last accessed Feb. 23, 2024).

CLASS ACTION COMPLAINT

54.     The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes members in a single action will provide substantial benefits to the parties and Court.

55.     Questions of law and fact common to Plaintiff and the Classes include, but are not limited to, the following:

    a.   whether PMI owed a duty of care to Plaintiff and the Classes;

    b.   whether PMI knew or should have known that the Stanley cups contained, or may contain, lead;

    c.   whether PMI wrongfully represented and continues to represent that the Stanley cups are dishwasher safe, durable, and suitable for household and outdoor use when they contain lead;

    d.   whether PMI wrongfully failed to disclose that the Stanley cups contained lead;

    e.   whether PMI's representations in advertising, packaging, and/or labeling are false, deceptive, and misleading;

    f.   whether those representations are likely to deceive a reasonable consumer;

    g.   whether a reasonable consumer would consider the presence of lead as a material fact in purchasing a Stanley cup;

    h.   whether PMI had knowledge that those representations were false, deceptive, and misleading;

    i.   whether PMI continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

    j.   whether PMI's representations and descriptions on the labeling of the Stanley cups are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

k.  whether PMI violated the laws of the State of New York;

l.  whether PMI violated the laws of the State of Washington;

m.  whether PMI engaged in unfair trade practices;

n.  whether PMI engaged in false advertising;

o.  whether PMI made negligent misrepresentations and/or omissions;

p.  whether PMI failed to warn adequately of the dangers of use of Stanley cups that have been damaged, among other things;

q.  whether Plaintiff and the members of the Classes are entitled to actual, statutory, and punitive damages; and

r.  whether Plaintiff and members of the Classes are entitled to declaratory and injunctive relief.

56.  PMI engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

57.  Plaintiff's claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to PMI's conduct.

58.  Plaintiff will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

59.  Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

CLASS ACTION COMPLAINT

60.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

61.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### Fraud by Omission
### (On Behalf of Plaintiff Barbu and the Classes)

62.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

63.     PMI concealed from and failed to disclose to Plaintiff and the Classes that its Stanley cups contained lead that do not conform to the products' labels, packaging, advertising, and statements.

64.     PMI was under a duty to disclose to Plaintiff and the Classes the true quality, characteristics, and suitability of the Stanley cups because: (1) PMI was in a superior position to know the true state of facts about its products; (2) PMI was in a superior position to know the actual characteristics and suitability of the Stanley cups for use by consumers; and (3) PMI knew that Plaintiff and the Classes could not reasonably have been expected to learn or discover that the Stanley cups were misrepresented in the packaging, labels, advertising, and website prior to purchasing the Stanley cups.

65.     The facts concealed or not disclosed by PMI to Plaintiff and the Classes are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Stanley cups.

66.     Plaintiff and the Classes justifiably relied on PMI's omissions to their detriment. The detriment is evident from the true quality and characteristics of the Stanley cups, which is inferior when compared to how the Stanley cups are advertised and represented by PMI.

67.     As a direct and proximate result of PMI's conduct, Plaintiff and the Classes have suffered actual damages in that they purchased Stanley cups that were worth less than the price they paid and that they would not have purchased at all had they known of the presence of lead that do not conform to the products' labels, packaging, advertising, and statements.

68. Plaintiff and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**COUNT II**
**Negligent Misrepresentation**
**(On Behalf of Plaintiff Barbu and the Classes)**

69. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70. PMI had a duty to Plaintiff and the Classes to exercise reasonable and ordinary care in the formulation, testing, manufacture, marketing, distribution, and sale of the Stanley cups.

71. PMI breached its duty to Plaintiff and the Classes by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Classes that do not have the qualities, characteristics, and suitability for use as advertised by PMI and by failing to promptly remove the Stanley cups from the marketplace or to take other appropriate remedial action.

72. PMI knew or should have known that the qualities and characteristics of the Stanley cups were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by PMI. Specifically, PMI knew or should have known that: (1) Stanley cups were not safe because they contained levels of lead; (2) the Stanley cups were not of superior quality because they contained lead that does not conform to the packaging; (3) the Stanley cups were adulterated, or at risk of being adulterated, by lead; and (4) the Stanley cups were otherwise not as warranted and represented by PMI.

73. As a direct and proximate result of PMI conduct, Plaintiff and the Classes have suffered actual damages in that they purchased Stanley cups that were worth less than the price they paid and that they would not have purchased at all had they known they contained lead or other materials that do not conform to the products' labels, packaging, advertising, and statements.

74. Plaintiff and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff Barbu and the Classes)**

75.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.      Substantial benefits have been conferred on PMI by Plaintiff and the Classes through the purchase of the Stanley cups. PMI knowingly and willingly accepted and enjoyed these benefits.

77.      PMI either knew or should have known that the payments rendered by Plaintiff and the Classes were given and received with the expectation that the Stanley cups would have the qualities, characteristics, and suitability for consumption represented and warranted by PMI. As such, it would be inequitable for PMI to retain the benefit of the payments under these circumstances.

78.      PMI's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for PMI to retain the benefits without payment of the value to Plaintiff and the Classes.

79.      Plaintiff and the Classes are entitled to recover from PMI all amounts wrongfully collected and improperly retained by PMI, plus interest thereon.

80.      Plaintiff and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**COUNT IV**
**Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Barbu and the New York Subclass)**

81.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.      New York General Business Law ("GBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

83.      In its advertising and sale of goods throughout New York, Defendant conducts business and trade within the meaning of GBL § 349.

15

84.     Defendant violated GBL § 349 by deceptively and misleadingly omitting that the Stanley cups contained lead.

85.     Defendant's omissions, concealment, and other deceptive conduct intentionally marketed that the Stanley cups were of a particular standard, grade, or quality when they in fact contained lead.

86.     Defendant's omissions, concealment, and other deceptive conduct described herein were directed at the consumer public at-large as they repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

87.     The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Barbu and the New York Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Stanley cups. Had Plaintiff Barbu and members of the New York Subclass known the Stanley cups did not have the quality and standards as advertised by Defendant and contained lead, they would not have purchased the Stanley cups or paid a premium price.

88.     Defendant alone possessed the information that was material to Plaintiff Barbu and the New York Subclass and failed to disclose such material information to consumers.

89.     Defendant has engaged and continues to engage in deceptive conduct in violation of GBL § 349.

90.     Defendant's omissions and other deceptive conduct caused Plaintiff Barbu and the New York Subclass to suffer injury in the form of actual damages when they purchased the Stanley cups that were worth less than the price paid and that they would not have purchased at all had they known the Stanley cups contained lead.

91.     Defendant intended for Plaintiff Barbu and the New York Subclass to rely on its omissions, concealment, and other deceptive conduct regarding the Stanley cups quality and standards when purchasing the Stanley cups, unaware of the undisclosed material facts.

92.     As a direct and proximate result of these violations, Plaintiff Barbu, the New York Subclass, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from further omitting the true quality and standards of the Stanley cups.

CLASS ACTION COMPLAINT

93.     Pursuant to GBL § 349(h) and § 350-D, Plaintiff Barbu and the New York Subclass seek injunctive relief and declaratory relief, full refund, compensatory and punitive damages, actual damages or $50 (whichever is greater), statutory and treble damages, and attorneys' fees.

**COUNT V**
**Violations of New York False Advertising Law, N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Barbu and the New York Subclass)**

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     New York General Business Law ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

96.     Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect. … [considering] representations made by statement, word [or] design [and] the extent to which the advertising fails to reveal facts material in the light of such representations."

97.     Defendant knew or should have known the Stanley cups did not have the quality and standards as described above because they contained undisclosed levels of lead.

98.     Defendant purposely concealed and did not disclose material facts regarding the presence of lead to consumers, such as Plaintiff Barbu and the New York Subclass.

99.     The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Barbu, the New York Subclass, and other reasonable consumers would have considered them when deciding whether to purchase the Stanley cups. Had Plaintiff Barbu and members of the New York Subclass known the Stanley cups did not have the quality and standards as advertised by Defendant and contained lead, they would not have purchased the Stanley cups.

100.    Defendant's conduct caused Plaintiff Barbu and the New York Subclass to suffer actual damages when they purchased the Stanley cups that were worth less than the price paid and that they would not have purchased at all had they known the Stanley cups contained lead.

101.    As a direct and proximate result of Defendant's violation of GBL § 350, Plaintiff Barbu and the New York Subclass have been injured, and that harm will continue unless Defendant is enjoined from further omitting the true quality and standards of its Stanley cups, including but

17

not limited to the presence of lead. Pursuant to GBL § 350-D, Plaintiff Barbu and the New York Subclass seek injunctive relief and declaratory relief, full refund, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

**COUNT VI**
**Violation of the Washington Consumer Protection Act**
**REV. CODE WASH. ANN. §§ 19.86.010, ET SEQ**
**(On Behalf of Plaintiff Barbu and the Class)**

102.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.     Defendant, Plaintiff, and the members of the Class all are persons within the meaning of the Washington Consumer Protection Act.

104.     At all relevant times, Defendant engaged in trade and commerce within the meaning of the Washington Consumer Protection Act.

105.     The Washington Act makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

106.     As alleged in this Complaint, Defendant's actions constitute unfair and deceptive acts and practices in the conduct of any trade or commerce in violation of the Washington Act. Defendant violated the Act by, among other things:

      a.   Representing that the Stanley cups have characteristics or benefits that they do not have;

      b.   Representing that the Stanley cups are of a particular standard, quality and grade when they are not; and

      c.   Failing to disclose material information concerning the Stanley cups known to Defendant at the time of advertisement or sale, with the intention of inducing Plaintiff and members of the Class to purchase the Stanley cups.

107.     Defendant intended that its unfair and deceptive acts and practices would take advantage of Plaintiff and the members of the Class by persuading them to purchase Stanley cups that would not perform as intended and don't provide the advertised benefits.

18

108.     The foregoing deceptive trade practices proximately caused Plaintiff and the members of the Class to suffer an ascertainable loss in the form of, among other things, overpayment of the Stanley cups that did not deliver the promised benefits.

109.     Moreover, Defendant's unfair and deceptive acts and practices are injurious to the public interest because the acts and practices have the capacity to injure other persons, had the capacity to injure other persons during the relevant period herein, and did injure other persons during that period.

110.     Plaintiff seeks to recover for the members of the Class the overcharges they incurred as a result of Defendant's deceptive practices, as well as treble damages and any other legal or equitable relief that the Court deems just and appropriate.

**COUNT VII**
**Manufacturing Defect**
**Washington Product Liability Act**
**(On Behalf of Plaintiff Barbu and the Class)**

111.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.     At all times mentioned herein, Defendant designed, manufactured, tested, marketed, sold, and distributed the Stanley cups used by Plaintiff.

113.     At all relevant times, the Stanley cups used by Plaintiff were expected to and did reach Plaintiff without a substantial change in their anticipated or expected condition as manufactured, handled, distributed, and sold by Defendant.

114.     At all relevant times, the Stanley cups used by Plaintiff were shipped and stored in compliance with Defendant's express written instructions.

115.     At all relevant times, the Stanley cups used by Plaintiff were used in a manner that was foreseeable and intended by Defendant.

116.     The Stanley cups used by Plaintiff were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that the design and manufacture posed an unreasonable risk of harm to Plaintiff.

CLASS ACTION COMPLAINT

117.     Defendant's Stanley cups are inherently dangerous and defective, unfit, and unsafe for their intended and reasonably foreseeable uses, and accordingly do not meet or perform to the expectations of ordinary consumers.

118.     The Stanley cups create risks to the health and safety of consumers that far outweigh the cost to Defendant to utilize a lead-free seal.

119.     Defendant's manufacturing defect includes but is not limited to failure to utilize a lead-free plug to create its vacuum-insulated vessels.

120.     Accordingly, the Stanley cups deviated in a material way from the performance standards of the Defendant and/or deviated in some material way from otherwise identical units of the same product line.

121.     The manufacturing defects in Defendant's Stanley cups were substantial factors in causing Plaintiff's injuries.

122.     As a direct and proximate result of Defendant's conduct described herein, Plaintiff has been injured because she purchased a defective product she otherwise would not have purchased, did not receive the benefit of the bargain, and/or suffered out-of-pocket loss.

123.     Accordingly, Plaintiff would not have: (a) been subjected to the risk of exposure to lead; and (b) sustained a significantly increased risk of developing various types of serious ailments.

124.     As a direct and proximate result of Defendant's actions and omissions, Plaintiff has a significantly increased risk of developing serious ailments and has suffered economic losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against PMI as to each and every count, including:

A.     An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Classes, and requiring PMI to bear the costs of class notice;

B.     An order enjoining PMI from selling the Stanley cups until the levels lead are removed or full disclosure of the presence of such appears on all labels, packaging, and advertising;

C.     An order enjoining PMI from selling the Stanley cups in any manner suggesting or implying that they are safe for use;

---

D.      An order requiring PMI to engage in a corrective advertising campaign and engage in further necessary affirmative injunctive relief, such as recalling existing products;

E.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining PMI from continuing the unlawful practices alleged herein, and injunctive relief to remedy PMI's past conduct;

F.      An order requiring PMI to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

G.      An order requiring PMI to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      An order requiring PMI to pay all actual and statutory damages permitted under the counts alleged herein;

I.      An order requiring PMI to pay punitive damages on any count so allowable;

J.      An order awarding attorney's fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Classes; and

K.      An order providing for all other such equitable relief as may be just and proper.


**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  February 24, 2024                         Respectfully submitted,

                                                  */s/ Lori G. Feldman*
                                                  Lori G. Feldman (WSBA #29096)
                                                  **GEORGE FELDMAN MCDONALD
                                                  PLLC**
                                                  102 Half Moon Bay Drive
                                                  Croton-on-Hudson, NY 10520
                                                  Tel: (917) 983-9320
                                                  Fax: (888) 421-4173
                                                  lfeldman@4-justice.com

David J. George
**GEORGE FELDMAN MCDONALD PLLC**
9397 Lake Worth Road, Suite 302
Lake Worth, FL  33467
Tel: (561) 232-6002
Fax: (888) 421-4173
dgeorge@4-justice.com

***Attorneys for Plaintiff***

CLASS ACTION COMPLAINT